**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAS COMPANIES, INC.,** | : | |
| **Plaintiff** | : | **No. 1:25-cv-01731** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **LOVE'S TRAVEL STOPS &** | : | |
| **COUNTRY STORES, INC.,** | : | |
| **Defendant** | : | |

**MEMORANDUM**

Before the Court is Defendant Love's Travel Stops & Country Stores, Inc. ("Defendant" or "Love's")'s motion to dismiss several counts of Plaintiff DAS Companies, Inc. ("Plaintiff" or "DAS")'s complaint. (Doc. No. 8.) For the reasons that follow, the Court will grant in part and deny in part Defendant's motion.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff is a corporation with its principal place of business in Palmyra, Pennsylvania. (Doc. No. 1 ¶ 13.) Plaintiff alleges that it served as a partner and distributor to Defendant—which operates travel stops across the country—for more than twenty years. (Id. ¶ 1.) In particular, the parties' contracts have set forth "plan-o-grams" detailing the "sets of specific products that Love's desired to purchase from DAS" for its stores. (Id. ¶ 2.) Through the "plan-o-grams," the parties would "cooperatively determine" where specific products—for instance, air fresheners—"would be displayed, what companion products would be displayed along the air fresheners to drive companion sales," and the parties would track performance to determine

[1] The factual background is drawn from Plaintiff's complaint (Doc. No. 1), the allegations of which the Court accepts as true for purposes of the pending motion to dismiss. See Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017).

"which items should be moved in and out of the plan-o-gram." (Id. ¶ 27.) Plaintiff asserts that, together, "DAS and Love's grew Love's business by tens, and later hundreds, of millions of dollars annually, and helped fuel Love's expansion to over six-hundred Travel Centers across the country." (Id. ¶ 3.) Plaintiff asserts that it services each store "every two weeks to thirty days," and since 2003 has "sold, distributed, serviced[,] and upgraded the products" for the categories of business in the "plan-o-grams." (Id. ¶¶ 4–5.) Plaintiff alleges that it also developed "a network of top global manufacturers . . ., state-of-the-art merchandising, private label packing, and sophisticated IT systems, which helped fuel Love's growth." (Id. ¶ 6.)

However, despite Defendant's "contractual obligations to purchase all products found in the plan-o-grams through DAS," Plaintiff asserts that "Love's systematically embarked on a strategy to eliminate DAS as the 'middleman' for its own financial gain." (Id. ¶ 7.) Plaintiff alleges that "Love's misappropriated DAS's confidential and proprietary information to surreptitiously negotiate deals directly with DAS's manufacturers, vendors, and other suppliers" in order to "hijack DAS's logistics and distribution network while still under contract with DAS." (Id. ¶ 8.) Love's allegedly deceived DAS's "manufacturers and vendors to sell directly to Love's," and required that they "sign non-disclosure agreements while Love's was still under contract with DAS." (Id. ¶ 9.) Love's also allegedly "provided in bad faith a fraudulent end of year reconciliation for 2024 in a transparent attempt to avoid paying DAS monies that are owed." (Id. ¶ 10.) Plaintiff alleges that it incurred "substantial monetary damages" as a result of Defendant's conduct. (Id. ¶ 11.)

The parties entered into the contract at issue here—the parties' "Sales, Supply and Distribution Agreement"—with an effective date of January 1, 2022. (Id. ¶ 17.) The contract had a three-year term, ending December 31, 2024, and "could only be terminated by Love's for

cause or due to DAS's bankruptcy or insolvency." (Id. ¶ 20.) The contract was "effectively a renewal of the prior agreement between the parties." (Id.) The contract identified categories of business and each "plan-o-gram" identified individual products within the categories of business, which DAS would resell to Love's. (Id. ¶¶ 22–25.) "DAS would acquire the products contained in the plan-o-grams," and then "resell, supply, service and distribute them to Love's travel stop locations." (Id. ¶ 21.) The contract "specifically require[d] continued cooperation on plan-o-grams and the subsequent purchase of products by DAS and resale to Love's." (Id. ¶ 26.) The parties would "cooperatively determine where" to display products, which companion products to display alongside them to drive companion sales, and would "track[] the sales numbers to determine which items should be moved in and out of the plan-o-gram." (Id. ¶ 27.)

DAS asserts that, in addition to the parties' contractual obligations, DAS "routinely introduced Love's to DAS's manufacturers, suppliers[,] and vendors," including "to allow Love's to inspect those entities' facilities." (Id. ¶ 31.) Further, DAS "put together a team of employees to service Love's and provide Love's with top-of-the-line customer service," and, "in reliance on Love's promises" and representations, including that Love's would "purchase from DAS $200 million worth of products annually . . . DAS purchased a new 200,000 [square foot] warehouse facility . . . to support over 20 million pieces of product." (Id. ¶¶ 32–33.)

DAS states that, prior to signing the January 1, 2022 contract, "Love's indicated to DAS that Love's wanted to expand its 'Private Label' offerings of products that were supplied by DAS but branded as Love's items." (Id. ¶ 35.) In that vein, "the Contract obligated Love's to include DAS in the distribution chain for Private Label Products, whether they were purchased directly from DAS or purchased directly from a vendor and distributed by DAS." (Id. ¶ 38.) "DAS, in turn, was obligated to supply sufficient quantities of Private Label and other products

to Love's Locations." (Id. ¶ 39.) DAS alleges that Love's ultimately "gutt[ed] DAS's contractually-awarded Categories of Business [] and replac[ed] every product with their own brand, or through other suppliers, during the Term of the Contract, for Love's financial gain as well as catastrophic financial damages to DAS." (Id. ¶ 48.)

DAS alleges that, in entering the at-issue contract, it relied on the understanding that the contract "would be executed with the same integrity and compliance" as the parties' prior contracts over the previous twenty-plus years. (Id. ¶ 49.) Further, "Mr. Mark Romig, Vice President of Purchasing for Love's, personally represented Love's projection to hit $200 million in revenue from DAS-distributed items per year for each of the three years of the Contract." (Id. ¶ 50.) In reliance on this representation, DAS allegedly "negotiated with Love's an upfront rebate in product pricing from 2% to 2.5%," as well as "new store payments" by DAS to Love's, which "grew from $30,000 to $50,000 per new store." (Id. ¶¶ 51–52.) DAS asserts that Love's "had other plans to eliminate DAS as the 'middleman' and never intended to live up to its obligations," and that Mr. Ronig and Love's "were using the Contract as a smokescreen [for Love's] to begin buying, directly from overseas, similar products." (Id. ¶¶ 56–57.) Some of these overseas vendors were "DAS's confidential sources." (Id. ¶ 57.)

DAS asserts that, in June 2022, a senior executive, DAS's Director of National Accounts, "quit without notice and the following day bought a plane ticket to Love's corporate offices in Oklahoma City using DAS's corporate credit card." (Id. ¶ 61.) This senior executive had "signed a Confidentiality, Non-Compete, and Non-Solicitation Agreement [] as a condition of his employment at DAS" and "knew intimately DAS's confidential pricing model to Love's, import product pricing and sourcing as well as many other trade secrets and business strategies which could damage DAS's relations with Love's and other customers if disclosed." (Id. ¶¶ 62, 65.)

"[T]he former Senior Executive met with Mr. Mark Romig," and DAS alleges that "it is believed that the former Senior Executive shared with Romig DAS's confidential business strategies and profit margin information, which Romig and Love's then used against DAS." (Id. ¶¶ 64–66.)

DAS alleges that, shortly after the meeting between Mr. Romig and DAS's former senior executive, "Love's and Romig began provoking a pretextual contract dispute" in "an attempt to have DAS terminated as Love's supplier and distributor, which in turn would allow Romig and Love's to contact DAS's vendors directly." (Id. ¶ 68.) DAS asserts that in a July 2022 meeting "it was evident that something had drastically shifted in the relationship," and from that point "DAS was treated as the enemy." (Id. ¶ 69.) For instance, "in the summer of 2022, DAS informed Love's of [$1 million worth of] Love's Private Label inventory that was dead or overstock . . . that they needed to purchase from DAS, to which the Love's purchasing team responded[:] '[s]o what's that to us.'" (Id. ¶ 70.) DAS alleges that the "lack of follow through and purchasing of Love's Private Label items was a violation of the agreement and caused DAS financial harm." (Id. ¶ 71.) DAS states that, at an October 2022 meeting, "DAS again brought up the over $1,000,000 worth of dead/excess Love's Private Label Product that Love's needed to purchase," to which Mr. Romig responded by "perform[ing] a vulgar act with vulgar language" and instructing "his people to 'get that product out of [their] building.'" (Id. ¶ 73.)

"In another example . . . from August 2022, DAS offered Love's opportunity buys on about $10 million worth of product," to which Love's initially "gave DAS orders for over $1,400,000 worth of opportunity buys," however, later "DAS was told by the buyers that Mr. Romig cut the orders to under $400,000 . . . with the statement, '[l]et's see how bad DAS needs money.'" (Id. ¶ 72.) DAS also alleges that, at multiple "Consumer Electronics Shows, which both DAS and its vendors attended along with Love's, a senior executive of Love's kept

repeating the same false narrative that they were hearing that DAS was in financial trouble." (Id. ¶ 74.) DAS also alleges that, as part of the parties' pricing agreement, "DAS baked in certain costs for freight," and that if "freight costs were pushed above a certain level . . . Love's would pay an increased price on those products," but also "the parties negotiated a separate agreement whereby increased freight charges would be paid separately and in lieu of a Contractually-allowed price increase on the cost of goods." (Id. ¶¶ 77–79.) However, according to Plaintiff, at "another meeting in late 2022, Romig again flouted Love's agreement to pay for freight costs due to import container price increases," in particular, "Romig informed DAS that Love's was no longer going to pay any increased freight costs." (Id. ¶¶ 76, 80.) DAS states that it "later learned that Romig, prior to the meeting, had informed other Love's employees that he intended to 'smash [DAS's] skulls in this meeting'" and "attempt to squeeze DAS out of business." (Id. ¶ 81.)

DAS asserts that, when the parties entered the contract in 2022, Love's advised DAS that it expected to expand by "approximately twenty-six stores per year." (Id. ¶ 84.) DAS was obliged under the contract to supply existing travel stops as well as "travel stops that come into existence after the Effective Date." (Id. ¶ 83.) "DAS paid to Love's $50,000 per new store allowance, commonly referred to as a 'slotting fee,' for each new store." (Id. ¶ 85.) DAS states that it did pay the "slotting fees" for new Love's stores throughout the term of the contract, but that Love's "nevertheless decreased its orders from DAS to a trickle throughout the last eighteen (18) months of the Contract, even when DAS had more than enough inventory to supply new Love's locations." (Id. ¶¶ 87–88.) DAS asserts that this "robbed DAS of the benefit of its bargain," and states that "[i]t is further believed that Love's resold the same shelf space to other distributors and vendors during the Term of the Contract." (Id. ¶¶ 89–90.)

DAS also asserts that Mr. Romig "regularly stopped" Love's buyers from making purchases from DAS's "new product launches." (Id. ¶ 91.) DAS details that it developed "revolutionary new products," that "Love's had committed to the new products," and that "Love's managers and buyers wanted to buy the new products," but that "Mr. Romig refused to allow those buyers to purchase those new products from DAS," which left DAS "with millions of dollars of inventory . . . imported specifically for Love's based on their commitments to purchase." (Id. ¶¶ 92–94.) DAS alleges that "Love's even tried to buy $1,000,000 worth of a DAS exclusive product directly from DAS's vendor, thereby attempting to cut DAS out of the transaction," and "[w]hen the vendor said the item is DAS's product . . . Love's then offered to buy over $2,000,000 worth of the product to cut DAS out entirely." (Id. ¶¶ 96–97.) "Love's then threatened to go direct to the licensor of the brand to get them to sell direct to Love's again simply to cut DAS out of the relationship." (Id. ¶ 98.) Further, "[w]hen the vendor ultimately refused to sell the products directly to Love's, Love's decided to not buy those products at all rather than buy them from DAS." (Id. ¶ 99.)

DAS next alleges that Love's "hir[ed] DAS's former Vice President of Purchasing," Tyler Scherner, who had resigned from DAS in November 2022. (Id. ¶¶ 101, 105.) Shortly after his resignation, "Mr. Romig called the CEO of DAS and asked to hire" Mr. Scherner, to which "the CEO of DAS explained [that Mr. Scherner] had a two year non-compete and nondisclosure agreement with DAS and that he believed Scherner could not work for Love's." (Id. ¶¶ 102–03.) In response, "Mr. Romig assured the CEO of DAS that Love's would put Scherner in Love's tire department selling tires for the next two years until the non-compete expired," however "it is believed that [Mr. Scherner] was put into full use by Love's to contact DAS's suppliers to secure products directly by Love's or through other distributors." (Id. ¶¶ 104, 106.)

Love's was also allegedly "surreptitiously reaching out to DAS's vendors and routinely threatening them by telling them that DAS was insolvent and that their products would no longer be carried in Love's Locations if the vendor did not agree to sell to Love's directly." (Id. ¶ 108.) "Love's claim[ed that] DAS agreed with Love's plan to go direct, and would then 'invite' the vendors to submit bids to Love's and force the vendors to sign Love's vendor agreements, which contained confidentiality provisions," therefore punishing or threatening punishment "if the vendor tried to independently corroborate Love's false statements." (Id. ¶ 109.) The purpose was "to convince DAS's suppliers to sell to Love's directly, and eliminate DAS as the 'middleman,'" and "in many cases[,] Love's demanded that the vendor begin providing the same exact products on the DAS-Love's plan-o-grams to Love's directly, without DAS's involvement." (Id. ¶¶ 110–11.) DAS asserts that these "secretive requests . . . were made despite Love's contractual agreement that it would include DAS in these discussions when Love's contacted a vendor directly, and Love's was required to use DAS to distribute such products." (Id. ¶ 112.) DAS asserts that Love's breached multiple contractual provisions by "secretly negotiating directly with" DAS's vendors "in order to eliminate DAS" and that this represented part of a "broader strategy to harm DAS financially." (Id. ¶¶ 115–16.) DAS alleges that "Love's scheme was driven by the termination provision in the Contract which would have allowed Love's to terminate DAS if DAS was insolvent," thus permitting Love's to "buy directly from DAS's vendors." (Id. ¶ 117.)

"In another example," DAS asserts that "Love's lied to a key vendor DAS used to develop proprietary displays for its products." (Id. ¶ 123.) For Love's, DAS created a "Private Label brand known as 'Mobile-To-Go-Zones[,]' which consisted of mobile phone accessories and similar products to be sold in Love's stores." (Id. ¶ 124.) In furtherance of this line of

business, "DAS had its marketing team develop exclusive displays for Mobile-To-Go products," and "DAS then also supplied the Private Label Products that would sit in these displays." (Id. ¶¶ 125–27.) DAS asserts that it "provided these displays to Love's at virtually a pass-through cost" due to the parties' "longstanding relationship," yet "Love's contacted the vendor," "told the vendor that DAS was overcharging," "and then asked to buy those same displays directly without DAS's involvement." (Id. ¶¶ 128–29.) DAS asserts that, "when the vendor asked why DAS was not distributing the displays anymore, Love's deceived the vendor by claiming that DAS would still be involved," despite the fact that Love's "had no intention of involving DAS," and "in fact did not involve DAS." (Id. ¶¶ 130–31.)

From 2023 through 2024, Love's allegedly "systematically deleted all products from the plan-o-grams." (Id. ¶ 133.) This included "categories such as tools, locks, gloves, lights, and lenses," and Love's deleted items "even though they were profitable." (Id. ¶¶ 134–35.) DAS asserts that the contract "required DAS to rank plan-o-gram items in terms of profitability for Love's review, and in the past the parties periodically reviewed these rankings to remove underperforming items." (Id. ¶ 136.) However, near the end of the contract, "Love's weaponized the plan-o-grams by deleting high-performing and profitable items, because by then, it had all of DAS's supplier information and intended to eliminate DAS as the 'middleman.'" (Id. ¶ 137.) As a result, "DAS saw steady and substantial decreases in sales revenue from 2023 through December 20, 2024 when Love's unilaterally stopped all purchases." (Id. ¶ 140.)

Lastly, DAS alleges that Love's "fail[ed] to honor the contractual repayment of the rebate to which DAS was entitled." (Id. ¶ 145.) In particular, the contract specified "that at the end of every year, Love's and DAS would calculate the volume of Love's annual purchases for that year and, if they were above a certain threshold, Love's would receive a rebate fixed to a certain

contractual percentage based on volume," but if sales were lower than the threshold, "DAS was entitled to a return of the pre-paid portion of the Volume Incentive Rebate." (Id. ¶¶ 146–47.) At the end of 2024, "due to the significant dropoff in purchases from Love's due to the conduct described above, DAS was due a repayment and overall reconciliation in excess of $5 million," but "Love's refused to pay." (Id. ¶¶ 148–49.) DAS asserts that "Love's then cooked up an entirely fictional purchase history that differed significantly from its actual purchases made in 2024, and claimed DAS owed Love's a reconciliation payment of slightly higher than $5 million," and that Love's did this to "create a completely fictional dispute over who was entitled to this significant repayment" and to "avoid paying DAS." (Id. ¶¶ 150–52.)

**B. Procedural Background**

On September 16, 2025, Plaintiff filed a complaint against Defendant alleging various claims arising from the parties' business relationship: breach of contract (Count I); breach of implied covenant of good faith and fair dealing (Count II); negligent breach of contract (Count III); tortious interference with contractual relations (Count IV); misappropriation of trade secrets (Count V); fraudulent inducement (Count VI); violation of the Oklahoma Deceptive Trade Practices Act (Count VII); and unjust enrichment (Count VIII). (Doc. No. 1.) Plaintiff attached the parties' "Sales, Supply and Distribution Agreement" as Exhibit 1 to the complaint. (Doc. No. 1-1.) On October 15, 2025, Defendant filed a motion to dismiss all but the breach of contract claim (Count I) (Doc. No. 8), and on October 29, 2025 filed a brief in support of the motion to dismiss (Doc. No. 9). Also on October 29, 2025, Defendant filed an unopposed motion (Doc. No. 10) to seal portions of Exhibit 1, claiming that "[w]ithout such redaction and sealing, Love's will be harmed by having its confidential contract terms, including pricing, payment, and rebate terms, publicly available to competitors, vendors, and third parties" (Doc.

No. 11 at 2). On November 5, 2025, the Court issued an Order granting Defendant's motion to seal portions of Exhibit 1. (Doc. No. 12.) After obtaining an extension of time to respond, Plaintiff filed its brief in opposition (Doc. No. 15) to Defendant's motion to dismiss on November 25, 2025, and Defendant filed its reply brief (Doc. No. 16) on December 22, 2025. Having been fully briefed, Defendant's motion to dismiss is ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that

the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III. DISCUSSION

As noted supra, Defendant seeks dismissal of seven of Plaintiff's eight claims. The Court will discuss each in turn.[2]

[2] The parties each cite to Oklahoma law, in accordance with the choice of law provision in their contract. See (Doc. No. 1-1 at 20) ("**Governing Law**. This Agreement and each order placed by Love's and accepted by DAS shall be governed by and construed in accordance with the laws of the State of Oklahoma without regard to the choice of laws provisions of such law"); see also

### A. Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

Plaintiff asserts a claim for breach of the implied covenant of good faith and fair dealing, stating that it "justifiably expected that Love's would honor its contractual obligations," but that "Love's failed and refused to discharge its contractual responsibilities." (Doc. No. 1 ¶¶ 160–63.)

"Every contract in Oklahoma contains an implied duty of good faith and fair dealing," but "[i]n ordinary commercial contracts, a breach of that duty merely results in damages for breach of contract, not independent tort liability." See Wathor v. Mut. Assur. Adm'rs, Inc., 87 P.3d 559, 561 (Okla. 2004).

> A claimant asserting a cause of action for breach of the implied covenant must allege "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party."

Orthman v. Premiere Pediatrics, PLLC, 545 P.3d 124, 138 (Okla. Civ. App. 2024) (quoting Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc., 607 F.3d 742, 747 (11th Cir. 2010)). The Orthman court explained that "the Oklahoma Supreme Court has only implemented a nondelegable duty of good faith and fair dealing to insurance contracts by recognizing the special relationship between the insurer and its insured, giving rise to an independent action in tort." See id. (internal quotations omitted). Further, "[w]ithout case law establishing an equivalent special relationship between patients and medical professionals in the context of electronic medical records," the court refused to find that the defendant "breached an implied covenant of good faith

---

Kruzits v. Okuma Mach. Tool, Inc., 40 F.3d 52, 55 (3d Cir. 1994) (stating that "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them"). The parties also cite to Oklahoma law in reference to Plaintiff's tort and statutory claims. The Court thus applies Oklahoma law to Plaintiff's claims.

and fair dealing." See id. "The special relationship that gives rise to tort liability for bad faith is marked by (1) a disparity in bargaining power where the weaker party has no choice of terms, also called an adhesion contract, and (2) the elimination of risk." Embry v. Innovative Aftermarket Sys. L.P., 247 P.3d 1158, 1160 (Okla. 2010).

Defendant asserts that, because "Plaintiff seeks tort recovery for an alleged breach of the implied duty of good faith and fair dealing," Plaintiff is required to plead a "special relationship," and that because it did not do so, Plaintiff fails to state a claim for breach of the implied duty of good faith and fair dealing. (Doc. No. 9 at 13.) Plaintiff argues, in response, that "the disagreement on this issue appears to be [as to] the correct measure of damages," and that tort recovery is one of the two remedies for breach of the implied covenant—"contract recovery" is the other. (Doc. No. 15 at 11.) Plaintiff asserts that Federal Rule of Civil Procedure 8 permits pleading in the alternative and that the implied covenant "attaches to all contracts in Oklahoma, so long as only one recovery is had." (Doc. No. 15 at 12.) In reply, Defendant asserts that Plaintiff "misreads" the relevant case law and that Orthman "confirms that a special relationship is required for breach of the implied covenant of good faith and fair dealing claims." (Doc. No. 16 at 3.)

Upon careful consideration of the allegations of Plaintiff's complaint, the briefs of the parties, and the relevant authority, and accepting as true all factual allegations in Plaintiff's complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiff, the Court finds that Plaintiff's complaint fails to state a claim for breach of the implied duty of good faith and fair dealing. As Defendant articulates, the court in Orthman affirmed dismissal of a breach of implied covenant of good faith and fair dealing claim because the plaintiff had not pleaded a "special relationship" between the parties. See Orthman, 545 P.3d

at 138 (affirming the trial court's dismissal and finding that without a showing of a special relationship "between patients and medical professionals in the context of electronic medical records, we cannot find Premiere breached an implied covenant of good faith and fair dealing," therefore "Orthman failed to establish a cause of action for Breach of the Covenant of Good Faith and Fair Dealing"). The Court is persuaded by the Oklahoma intermediate appellate court's decision, which carries significant weight in the instant case. See Covington v. Cont'l Gen. Tire, Inc., 381 F.3d 216, 218 (3d Cir. 2004) (stating that, for a federal court exercising diversity jurisdiction, "[t]he decision of an intermediate state court is particularly relevant and is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise") (internal citations omitted).

Other courts weighing the issue have also declined to find that an independent claim for breach of an implied covenant of good faith and fair dealing exists under similar circumstances. See Rivera-Pierola v. Bd. of Regents for Oklahoma Agric. & Mech. Colleges, No. 21-cv-00616, 2022 WL 1527526, at *5 (W.D. Okla. May 13, 2022) (stating that, to "maintain a free-standing claim for violation of good faith and fair dealing, Mr. Rivera-Pierola must establish that a special relationship existed between the contracting parties"); see also Brown v. Blackstone Consulting, Inc., No. 21-cv-00353, 2021 WL 5166023, at *4 (W.D. Okla. Nov. 5, 2021) (stating that "Plaintiff acknowledges there is no case law finding that such a special relationship exists in the case of an ordinary commercial contract . . . [t]herefore, the Court grants Blackstone's motion [to dismiss] as it pertains to Mr. Brown's bad faith breach of contract claim"); Warrenfeltz v. Hogan Assessment Sys., Inc., No. 17-cv-00428, 2018 WL 1546559, at *3 (N.D. Okla. Mar. 29, 2018) (collecting cases and concluding that "Oklahoma courts have declined to permit bad faith tort claims in the context of a variety of commercial contracts," and finding that "this court is not

persuaded that the contractual relationships in this case fall within the narrow scope of special relationships that provide a basis for bad faith tort liability").[3] Accordingly, the Court will grant Defendant's motion with respect to Plaintiff's claim for breach of the implied duty of good faith and fair dealing.

### B. Plaintiff's Negligent Breach of Contract Claim (Count III)

Plaintiff asserts a negligent breach of contract claim, alleging that "[e]very contract under Oklahoma law is accompanied by a common law duty to perform with care, skill, reasonable expediency, and faithfulness." (Doc. No. 1 ¶ 167.)

The Oklahoma Supreme Court has previously articulated a "common law duty to perform with care, skill, reasonable expediency, and faithfulness accompanies every contract." See Lewis v. Farmers Ins. Co., 681 P.2d 67, 69 (Okla. 1983). However, more recently, the Oklahoma Supreme Court clarified that there "is simply no general duty to use reasonable care in the performance of a contract. The duty of a party to a contract to act reasonably and diligently in the performance of a contract are encompassed within the implied covenant of fair dealing and good faith." See Embry, 247 P.3d at 1161. A district court recently found—in assessing any

[3] Plaintiff also asserts that it has adequately stated a claim by alleging that "Love's was grossly negligent and wanton in its conduct" toward Plaintiff. See (Doc. No. 15 at 12); Rodgers v. Tecumseh Bank, 756 P.2d 1223, 1227 (Okla. 1988) (stating that "[g]ross recklessness or wanton negligence on behalf of a party to a contract may call for an application of the theory of tortious breach of contract" but concluding that, "[w]ithout an independent basis to support a tortious wrongdoing, there is nothing more than an alleged breach of that contract"). Even assuming, arguendo, that such a cause of action exists under Oklahoma law, the Court would find that Plaintiff has failed to state such a claim here. See Warrenfeltz, 2018 WL 1546559, at *4 (rejecting the plaintiff's argument that it stated a claim by alleging reckless and wanton misconduct because "plaintiff's allegations relate to the deterioration of an arms-length, commercial business relationship"); see also Mcgivern, Gilliard & Curthoys v. Chartis Claims Inc., No. 12-cv-00200, 2012 WL 2917336, at *3 (N.D. Okla. July 17, 2012) (granting a motion to dismiss and finding that the plaintiff cannot "convert an ordinary breach of contract claim into a tort merely by alleging that the breach was intentional").

tension in the doctrine—that it "is bound to follow Embry insofar as it embodies the Oklahoma Supreme Court's most recent statement of state law with respect to the issue at hand." See Miller v. EOG Res., Inc., No. 19-cv-01033, 2020 WL 592339, at *3 (W.D. Okla. Feb. 6, 2020) (internal quotations omitted); see also T.D. Williamson, Inc. v. Lincoln Elec. Automation, Inc., No. 21-cv-00153, 2022 WL 16842907, at *3 (N.D. Okla. Jan. 21, 2022) (stating that Lewis was subsequently invoked to support a claim for negligent performance of contractual actions, but the Oklahoma Supreme Court later disavowed that construction"). Under Embry:

> the common-law duty to perform a contract with care, skill, reasonable expediency, and faithfulness is conceptualized as part and parcel of the duty of good faith and fair dealing, which, though inherent in every Oklahoma contract, does not give rise to independent tort liability in the absence of a special relationship between the parties.

See id. (internal citations omitted).

Plaintiff alleges in its complaint that "Love's negligently failed to observe" the care, skill, reasonable expediency, and faithfulness that Plaintiff asserts accompany every contract, specifically by "negligently fail[ing] to perform under the contract with faithfulness to its obligations and the 20-plus year course of dealing between the parties." (Doc. No. 1 ¶¶ 167–69.)

Defendant asserts that this claim fails because it "presents an alternative theory of breach of contract and is duplicative of [the Count I breach of contract claim]." (Doc. No. 9 at 15.) Defendant argues that "[t]he only extracontractual duty Plaintiff alleges Love's breached was the 'common law duty to perform with care, skill, reasonable expediency, and faithfulness'" (quoting Doc. No. 1 ¶ 167), but that this duty "is merely the implied covenant of good faith and fair dealing, which is a duty in tort that arises only where there is a special relationship." (Doc. No. 16 at 9.)

Upon careful consideration of the allegations of Plaintiff's complaint, the briefs of the

parties, and the relevant authority, and accepting as true all factual allegations in Plaintiff's complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiff, the Court finds that Plaintiff's complaint fails to state a claim for negligent breach of contract. Plaintiff, in its brief, strays from the complaint's allegations regarding Defendant's behavior. The complaint states that Defendant "negligently failed to perform under the contract." (Doc. No. 1 ¶ 169) (emphasis added). Instead, Plaintiff in its brief argues that "Oklahoma courts recognize a tort" when a defendant's behavior is "willful, designed, intentional, or malicious" and that "DAS has alleged adequately that Love's committed willful independent wrongs in the course of the parties' relationship." (Doc. No. 15 at 18) (emphasis added). However, Plaintiff is bound by the allegations in its complaint asserting a negligent failure to perform under the contract, and the law is clear that such a claim is foreclosed by Embry in the absence of a special relationship. See Miller, 2020 WL 592339, at *4 (W.D. Okla. Feb. 6, 2020) (finding that "[b]ecause Plaintiffs' negligence claim is premised on the theory of a general duty to use reasonable care in performing the parties' contract, it is foreclosed by Embry and will be dismissed under Rule 12(b)(6) for failure to state a claim"); see also Embry, 247 P.3d at 1161 (finding that "[t]he duty of a party to a contract to act reasonably and diligently in the performance of a contract are encompassed within the implied covenant of fair dealing and good faith"); Meyer v. Newrez LLC, No. 24-cv-00043, 2025 WL 242255, at *7 (N.D. Okla. Jan. 17, 2025) (rejecting a similar claim and stating that "Plaintiffs challenge Newrez's failure to act with skill, expediency, care, and faithfulness[, which] is [] simply proof of the defendants' breach of the implied duty to deal fairly and in good faith, and not an independent theory of recovery") (cleaned up). As such, the Court will grant Defendant's motion with respect to Plaintiff's negligent breach of contract claim.

### C. Plaintiff's Tortious Interference Claim (Count IV)

Plaintiff alleges a tortious interference with contractual relations claim, asserting that "Love's wrongfully and maliciously interfered" with Plaintiff's contractual relations with numerous vendors and suppliers "in an attempt to divert DAS's business to itself." (Doc. No. 1 ¶¶ 172–75.)

Plaintiff specifically pleads a tortious interference claim under Section 776A of the Restatement (Second) of Torts, which reads:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

See Restatement (Second) of Torts § 766A (1979). The Oklahoma Supreme Court recognizes a cause of action under Section 776A, and states that the provision "is concerned with conduct targeted at the plaintiff which hinders plaintiff's own performance or renders plaintiff's performance more burdensome or costly." See Wilspec Techs., Inc. v. DunAn Holding Grp., Co., 204 P.3d 69, 72 (Okla. 2009) (citing Restatement (Second) of Torts § 766A, Comment C (1979)). Although "section 766A does not require a breach or nonperformance for liability to attach," there must be an indication that "the inducer either prevents or hinders the performance of a valid contract to which it is not a party." See id. at 72–73.

Accordingly, to state a tortious interference claim under Oklahoma law, a plaintiff must plead sufficient facts to plausibly allege that:

> (1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage.

See id. at 74. "[T]he claim is viable only if the interferor is not a party to the contract or business

relationship." Id. Furthermore, the Oklahoma Supreme Court has held "that it is not unlawful for one to interfere with the contractual relations of another if [this is done] by fair means, if [it is] accompanied by honest intent, and if [it is done] to better one's own business and not to principally harm another." See Morrow Dev. Corp. v. Am. Bank & Tr. Co., 875 P.2d 411, 416 n.21 (Okla. 1994).

Defendant argues that the complaint "fails to allege facts supporting at least two elements of tortious interference" and therefore Count IV fails. (Doc. No. 9 at 17.) Defendant argues first that "Plaintiff does not allege any contract or business right that it lost because of Love's alleged conduct," and second, that "Plaintiff fails to allege Love's alleged interference was wrongful or malicious." (Id.) Defendant also asserts that, under Oklahoma law, "Plaintiff must allege that Love's caused third-parties to breach their contracts with Plaintiff" but that the complaint "includes no such allegation." (Id.)

In response, Plaintiff contends that it "properly alleged that it lost business from Love's wrongful interference," in particular that "Love's contacted one of DAS's vendors for 'Mobile-To-Go' displays and thereafter cut DAS out of that relationship, resulting in lost revenue for DAS." (Doc. No. 15 at 16.) Plaintiff articulates in its complaint that Love's had DAS create a brand known as "Mobile-To-Go-Zones" consisting of mobile phone accessories and similar products to be sold in Love's stores. (Doc. No. 1 ¶ 124.) Plaintiff alleges that "Love's contacted the vendor directly, told the vendor that DAS was overcharging Love's for the displays, and then asked to buy those same displays directly without DAS's involvement." (Id. ¶ 129.) Love's then allegedly "deceived the vendor by claiming that DAS would still be involved even though Love's was making the purchase directly" and Love's "in fact did not involve DAS in the distribution of those displays." (Id. ¶¶ 130–31.)

Upon careful consideration of the allegations of Plaintiff's complaint, the briefs of the parties, and the relevant authority, and accepting as true all factual allegations in Plaintiff's complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiff, the Court finds that Plaintiff's complaint states a plausible claim for tortious interference under Oklahoma law. As the Wilspec court stated, "section 766A does not require a breach or nonperformance for liability to attach," but there must be an indication that "the inducer either prevents or hinders the performance of a valid contract to which it is not a party." See Wilspec Techs., Inc., 204 P.3d at 72–73. The Court is persuaded that the above-cited factual assertions from Plaintiff's complaint—including the alleged outreach to Plaintiff's vendor and the alleged deception—constitute "sufficient factual matter" to plausibly allege that Defendant prevented or hindered the performance of a contract between Plaintiff and its vendor. See Fowler, 578 F.3d at 210; see also Hankins v. Welch State Bank, No. 14-cv-00398, 2014 WL 5472753, at *3 (N.D. Okla. Oct. 28, 2014) (finding that "[s]howing that a defendant's actions caused a third party not to perform an existing contract with plaintiff is, therefore, a recognized means of pleading the first element of a claim for tortious interference under Oklahoma law").

As for the second contested element—whether the alleged interference was malicious and wrongful—Defendant asserts that "there is nothing tortious, wrongful, or malicious about negotiating or executing contracts with vendors." (Doc. No. 9 at 19.) Defendant cites to a Tenth Circuit case interpreting Colorado law, in which the court stated that "tortious interference with a contract does not arise every time a third party negotiates with one of the contracting parties on the subject matter of the contract, or a seller deals with one buyer instead of another in a manner which may affect an existing contract." See Zelinger v. Uvalde Rock Asphalt Co., 316 F.2d 47, 51 (10th Cir. 1963).

Plaintiff argues that "DAS explicitly alleged that Love's conduct [] was done so wrongfully and maliciously." (Doc. No. 15 at 17.) In particular, Plaintiff alleges in its complaint that Love's contacted one of its vendors, "told the vendor that DAS was overcharging Love's for the displays, and then asked to buy those same displays directly without DAS's involvement," and then Love's "did not involve DAS in the distribution of those displays." (Id. ¶¶ 129–31.)

The Wilspec court refers to the Oklahoma Uniform Jury Instruction, which states that: "[a]n intentional interference may be malice in the law without personal hatred, ill will, or spite," and a defendant's conduct is intentional if the defendant "either desired to interfere with [Plaintiff]'s contract with [Third Party], or [he/she/it] was substantially certain that his actions would interfere with the contract." See Wilspec Techs., Inc., 204 P.3d at 74 n.5 (internal quotations omitted). The Court finds that, in accordance with the Oklahoma Uniform Jury Instruction, the allegations of Plaintiff's complaint are sufficient to plead, at this stage, a desire to interfere with Plaintiff's contract or a substantial certainty that Defendant's actions would interfere. See Wilspec Techs., Inc., 204 P.3d at 74 n.5; see also Hankins 2014 WL 5472753, at *5 (finding that, "[v]iewed in the light most favorable to plaintiffs, the complaint thus alleges an intentional act that was without justification or excuse"). Defendant does not challenge the sufficiency of Plaintiff's pleading with respect to the remaining elements of the tortious interference claim, and the Court accordingly finds that Plaintiff has adequately stated a claim and will deny Defendant's motion regarding this claim.[4]

[4] In its reply brief, Defendant also asserts that "Plaintiff's Complaint neither identifies any contracts nor explains how Plaintiff's performance of such contracts was more oppressive," and "falls short of explaining the effect [that Defendant's] actions had on Plaintiff's vague, unidentified purported contracts." (Doc. No. 16 at 7.) However, at this stage, the Court must accept as true not only the factual allegations in the complaint but also all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins.

### D. Plaintiff's Claim for Misappropriation of Trade Secrets (Count V)

Plaintiff asserts that "Love's misappropriated [Plaintiff's] trade secrets by meeting with and hiring DAS's former senior executives and acquiring those trade secrets." (Doc. No. 1 ¶ 182.) Plaintiff refers, in particular, to its "pricing and other economic terms," as well as "proprietary marketing products and designs." (Id. ¶¶ 178–79.)

A claim for misappropriation of trade secrets under Oklahoma law requires showing "(i) the existence of a trade secret, (ii) misappropriation of the secret by defendant[], and (iii) use of the secret to [Plaintiff's] detriment." See Blue Star Land Servs., LLC v. Coleman, No. 17-cv-00931, 2017 WL 6210901, at *7 (W.D. Okla. Dec. 8, 2017) (quoting MTG Guarnieri Mfg., Inc. v. Clouatre, 239 P.3d 202, 209 (Okla. Civ. App. 2010)).

"Trade secret" is defined to mean:

> information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> a. derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> b. is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

See Okla. Stat. tit. 78, § 86.

> Oklahoma has adopted six factors from the Restatement of Torts to help determine whether information is a trade secret: (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by

---

Brokerage Antitrust Litig., 618 F.3d at 312. Although Plaintiff does not explicitly cite to contracts between itself and the vendors at issue, Plaintiff refers, for instance, to "a key vendor [that] DAS used to develop proprietary displays for its products," and to communications with that vendor regarding Love's alleged efforts to cut DAS out of the relationship. (Doc. No. 1 ¶¶ 123–31.) The Court finds the complaint adequate to support reasonable inferences as to the existence of contracts between Plaintiff and its vendors.

> employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1245 (10th Cir. 2006) (citing Amoco Prod. Co. v. Lindley, 609 P.2d 733, 743 (Okla. 1980)).

Plaintiff alleges in its complaint that its "pricing and other economic terms contained in contracts with its key suppliers were and are proprietary trade secrets," and that additionally it "developed proprietary marketing products and designs which it supplied to Love's stores." (Doc. No. 1 ¶¶ 178–79.) Plaintiff alleges further that it "took reasonable steps to maintain the secrecy [of] this information," including through confidentiality and non-competition agreements with its employees. (Id. ¶ 181.) Plaintiff asserts that "Love's misappropriated these trade secrets by meeting with and hiring DAS's former senior executives and acquiring those trade secrets," and that "Love's then improperly used these trade secrets to negotiate against DAS with DAS's own vendors and suppliers, in order to split DAS from its suppliers and obtain lower prices for Love's directly." (Id. ¶¶ 182–83.)

Defendant argues that "Plaintiff fails to allege the existence of any trade secret" and further, that the complaint "lacks factual allegations plausibly suggesting Love's misappropriation." (Doc. No. 9 at 14-15.) Defendant asserts, in particular, that the complaint includes no allegation that Plaintiff derives independent economic value from the alleged secrecy of its pricing and other economic terms, as required by the Oklahoma trade secrets statute. (Doc. No. 9 at 14) (citing to Okla. Stat. tit. 78, § 86).

Plaintiff asserts in response that it is a "distributor which provides value in importing and delivering products to retailers like Love's," and therefore "its confidential pricing models,

import product pricing and sourcing methods, business strategies and profit margin information, are the trade secrets that derive independent economic value to DAS." (Doc. No. 15 at 21.) Plaintiff states that these provide a competitive advantage in that they could "damage DAS's relations with Love's and other customers if disclosed." (Id.) Plaintiff cites to its allegation in the complaint that a former senior executive of Plaintiff's, who had signed a confidentiality and non-competition agreement, resigned and then met with Defendant "in complete violation of [the non-competition requirement]," and "it is believed that [he] shared [] confidential business strategies and profit margin information." (Doc. No. 1 ¶¶ 62–66).

Upon careful consideration of the allegations of Plaintiff's complaint, the briefs of the parties, and the relevant authority, and accepting as true all factual allegations in Plaintiff's complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiff, the Court finds that Plaintiff's complaint states a plausible claim for misappropriation of trade secrets. Whether information constitutes a trade secret is a fact-intensive question. For support, Plaintiff points to a Tenth Circuit case describing that, generally, "[c]onfidential data regarding operating and pricing policies can . . . qualify as trade secrets." See Sw. Stainless, LP v. Sappington, 582 F.3d 1176, 1189 (10th Cir. 2009). In that case, the court identified various facts that weighed in favor of finding the existence of trade secrets, including that "[e]mployees sign confidentiality agreements . . . and Metals has spent hundreds of thousands of dollars accumulating and maintaining its confidential information." See id. Still, the Tenth Circuit ultimately reversed the district court's ruling and determined that the relevant information did not constitute a trade secret, articulating that "these facts do not establish enough," and instead:

> critical factors weigh against concluding that the Hughes Anderson quote was a

> trade secret: The bid was known outside of Metals, Metals took no measures to prevent Hughes Anderson from disseminating the information, and Rolled Alloys could properly acquire the information simply by requesting it from Hughes Anderson

See id. at 1189–90. Defendant cites to Double Eagle Alloys, Inc. v. Hooper, 134 F.4th 1078 (10th Cir. 2025), in which a company sued its former employee and competitor alleging trade-secret violations after the former employee, "[defendant] Hooper jumped ship for competitor Ace Alloys. He also took 2,660 files downloaded from his Double Eagle computer with him." See id. at 1084. The Tenth Circuit, applying Oklahoma law, affirmed the district court's grant of summary judgment to the defendants and held that the lower court "correctly concluded that Double Eagle's prices are not trade secrets, because Double Eagle shares its prices with customers and does not prevent its customers from sharing those prices." See id. at 1093. The Double Eagle court determined that "courts typically treat standard pricing models as insufficient to qualify as trade secrets" and may require a showing of uniqueness, complexity, or other particular advantage. See id. (collecting cases).

The Court finds that Plaintiff's complaint plausibly alleges the existence of a trade secret or trade secrets. Plaintiff has pleaded several categories of terms and documents that it alleges were confidential and proprietary, and also described in particular how a former employee met with Defendant in "violation of [a non-competition agreement]," and that DAS believes "that [he] shared [] confidential business strategies and profit margin information." (Doc. No. 1 ¶¶ 62–66, 178–181); see Integrated Bus. Techs., LLC v. Netlink Sols., LLC, No. 16-cv-00048, 2016 WL 4742306, at *2 (N.D. Okla. Sept. 12, 2016) (finding that the plaintiff adequately pleaded a trade secrets claim because "IBT has alleged that Grady and Former Employees misappropriated pricing schedules which could plausibly be deemed trade secrets depending upon the Court's

application of the six-factor test at later stages of the proceedings"). Discovery may reveal that Plaintiff cannot muster sufficient evidence to demonstrate the uniqueness, complexity, or other particularity such that a factfinder can conclude that the relevant information constitutes trade secrets. See Double Eagle Alloys, Inc., 134 F.4th at 1093. However, at this stage, Plaintiff's complaint pleads "sufficient factual matter" to plausibly allege the existence of trade secrets. See Fowler, 578 F.3d at 210.

As for misappropriation—the second element of the claim—the "Oklahoma Uniform Jury Instructions instruct that misappropriation must be the direct cause of damages to Plaintiff, but the subsequent Comments clarify that detriment would suffice," and a "flexible approach is applied to the calculation of damages in a misappropriation of trade secrets case." See Blue Star Land Servs., LLC, 2017 WL 6210901, at *7. Plaintiff's complaint adequately pleads misappropriation here. In its complaint, Plaintiff alleges that Love's met with and hired former DAS senior executives and "acquir[ed] those trade secrets, despite knowing those employees were under certain obligations of confidentiality and non-disclosure," and further that Love's "used these trade secrets to negotiate against DAS with DAS's own vendors and suppliers," from which DAS suffered "economic harm and competitive disadvantage." (Doc. No. 1 ¶¶ 182–86.) These allegations suffice to plausibly allege misappropriation. See Blue Star Land Servs., LLC, 2017 WL 6210901, at *8 (finding that the plaintiff pleaded a plausible trade secrets misappropriation claim by detailing various damages, including "unjust enrichment from their use of Blue Star's work templates . . . actual damages to the value of Plaintiff's client information . . . actual damages to Plaintiff's market share and, conversely, unjust enrichment to Defendants from using trade secrets to launch Rock Creek and compete directly"). Defendant does not challenge the sufficiency of Plaintiff's pleading with respect to the third element—the

use of any trade secret to [Plaintiff's] detriment. See Blue Star Land Servs., LLC, 2017 WL 6210901, at *7. Accordingly, the Court finds that Plaintiff's complaint plausibly alleges a misappropriation of trade secrets claim, and will deny Defendant's motion regarding this claim.

**E. Plaintiff's Fraudulent Inducement Claim (Count VI)**

Plaintiff asserts a fraudulent inducement claim, stating that on or before the finalization of the parties' January 1, 2022 contract, "Love's knew that it had no intention of honoring the Contract . . . and instead planned to use the Contract period as a 'bridge' period, during which it would steal DAS's vendors and obtain better pricing." (Doc. No. 1 ¶ 187.)

Under Oklahoma law:

> a claim for fraudulent inducement must allege all the elements of common law fraud. These are: (1) a material misrepresentation; (2) known to be false at the time made; (3) made with specific intent that a party would rely on it; and (4) reliance and resulting damage.

See Oak Tree Partners, LLC v. Williams, 458 P.3d 626, 646 (Okla. Civ. App. 2020). Furthermore, "to assert both a claim for fraud and a claim for breach of contract, the claims must be distinct." See Shoemaker Corp. III, Inc. v. Garrett, 704 F. Supp. 3d 1222, 1255 (N.D. Okla. 2023). "To determine whether a fraud claim is sufficiently distinct from a breach of contract claim, the Court considers whether the facts supporting each claim and the damages arising as a result of each claim are different." Id.

A common law fraud claim must be stated with particularity under Federal Rule of Civil Procedure 9(b). See Lundahl v. Pennsylvania Manufacturers Ass'n Ins. Co., No. 09-cv-01186, 2011 WL 13185814, at *7 (W.D. Okla. Feb. 2, 2011) (finding that "[t]he particularity requirement of Rule 9(b) also applies to common law fraud claims"); see also Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake"). "Plaintiffs may satisfy this requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004) (internal citations omitted).

Plaintiff states in its complaint that, when negotiating and entering the parties' latest contract, "Love's, apparently, had [] plans to eliminate DAS as the 'middleman' and never intended to live up to its obligations," and that Defendant and its vice president of purchasing "were using the Contract as a smokescreen to begin buying, directly from overseas, similar products," including from "overseas vendors [who] were DAS's confidential sources that Love's was only aware of because of the relationship DAS had with Love's." (Doc. No. 1 ¶¶ 56–57.)

Defendant argues that Plaintiff's fraudulent inducement claim is "merely a breach of contract claim in disguise" and that, accordingly, "Plaintiff's breach of contract and fraud claims are not distinct, and the fraud claim fails." (Doc. No. 9 at 23.) Defendant quotes a district court case in which the court articulated that, "[t]o determine whether a fraud claim is sufficiently distinct from a breach of contract claim, the Court considers whether the facts supporting each claim and the damages arising as a result of each claim are different." See Shoemaker Corp. III, Inc. v. Garrett, 704 F. Supp. 3d 1222, 1256 (N.D. Okla. 2023). The court there granted summary judgment because "two Counts are based on the same or substantially similar facts and seek the same damages." See id. at 1256. Plaintiff, in rejoinder, states that its fraudulent inducement claim is distinct from its breach of contract claim because "Love's committed an independent tort by fraudulently inducing DAS to enter into the Contract." (Doc. No. 15 at 23.)

Upon careful consideration of the allegations of Plaintiff's complaint, the briefs of the parties, and the relevant authority, and accepting as true all factual allegations in Plaintiff's

complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiff, the Court finds that Plaintiff's complaint fails to state a claim for fraudulent inducement. The Court concludes that the factual allegations supporting Plaintiff's fraudulent inducement claim are insufficiently distinct from those underpinning its breach of contract claim. The core allegation in support of Plaintiff's fraudulent inducement claim is that "Love's materially misrepresented to DAS at the time of Contract signing that it intended to be bound by the Contract . . . despite having no actual intention of doing so." (Doc. No. 1 ¶ 188.) This alleged misrepresentation is inherently entwined with any breach of contract claim with respect to the same contract. See Shoemaker Corp. III, Inc., 704 F. Supp. 3d at 1256 (granting summary judgment on the plaintiff's fraudulent inducement claim because the facts were "not sufficiently distinct from the facts alleged in support of [the breach of contract claim,]" and the counts were "based on the same or substantially similar facts and seek the same damages"); see also McGregor v. Nat'l Steak Processors, Inc., No. 11-cv-00570, 2012 WL 314059, at *3 (N.D. Okla. Feb. 1, 2012) (dismissing a fraud claim because the plaintiff's "fraud claim and his contract claim are based on precisely the same conduct, namely, defendants' alleged intention to breach the contract").

The alleged damages, too, as pleaded, appear to be part and parcel of any breach of contract. Plaintiff asserts that, as a result of the alleged fraudulent inducement, Plaintiff "took on significant costs to purchase inventory on Love's behalf that was never accepted for delivery, as well as other significant damages . . . such as lost profits." (Doc. No. 1 ¶ 191.) Plaintiff does not articulate how these alleged damages differ materially from the damages to which Plaintiff would be entitled under the asserted breach of contract claim. See McKnight v. Marathon Oil Co., No. 17-cv-00264, 2017 WL 1628981, at *2 (W.D. Okla. May 1, 2017) (dismissing a fraud

claim and stating that, "[b]ecause their allegation for fraud concerns the identical conduct [to the breach of contract claim], it will not suffice under Oklahoma law"); see also Wade v. EMCASCO Ins. Co., 483 F.3d 657, 676 (10th Cir. 2007) (interpreting a Kansas law requirement that fraud and breach of contract claims be distinct, and affirming summary judgment to defendant where the "injury [resulting from the alleged fraud] directly relates to the contract, and damages arising from this injury were recoverable under the breach of contract claim").

Even assuming, arguendo, that the Court found that the allegations were sufficiently distinct to survive as a standalone claim, the sum of Plaintiff's allegations in support of this claim are not specific enough to satisfy the heightened pleading requirements under Rule 9(b). A party alleging fraud "must state with particularity the circumstances constituting [such] fraud." See Fed. R. Civ. P. 9(b). Plaintiff states in its complaint that "Love's, apparently, had [] plans to eliminate DAS as the 'middleman' and never intended to live up to its obligations," and that the contract was "a smokescreen [for Love's] to begin buying, directly from overseas, similar products." (Doc. No. 1 ¶¶ 56–57.) Defendant argues persuasively that Plaintiff's "allegations are inadequate," because "Plaintiff fails to allege the 'where,'" because the 'when' is "both unspecific and inconsistent," and because "Plaintiff does not identify who [Love's employee] spoke with at Plaintiff's office" as part of the alleged inducement. (Doc. No. 16 at 15–16.) The Court agrees with Defendant that Plaintiff's allegations in support of this claim are insufficient under Rule 9(b). See Lum, 361 F.3d at 224 (requiring that "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation"); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997) (stating that "even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice . . . Plaintiffs must accompany their legal theory with factual allegations that make their

theoretically viable claim plausible"); Iqbal, 556 U.S. at 678 (rejecting "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"). Accordingly, the Court will grant Defendant's motion as to this claim.

### F. Plaintiff's Claim for Breach of the Oklahoma Deceptive Trade Practices Act (Count VII)

Plaintiff asserts that Defendant violated section 53(A)(8) of the Oklahoma Deceptive Trade Practices Act ("ODTPA") by "repeatedly contacting DAS's vendors and falsely insinuating DAS was insolvent and was unable to meet its obligations to those vendors." (Doc. No. 1 ¶ 194.)

The ODTPA provides a cause of action for a "person damaged or likely to be damaged by a deceptive trade practice of another." See Okla. Stat. tit. 78, § 54. The statute lists several "[a]cts constituting deceptive trade practices—[p]rima facie evidence of intent to injure competitors," including, "when in the course of business, vocation, or occupation, the person . . . [d]isparages the goods, services, or business of another by false or misleading representation of fact." See id. § 53(A)(8). A "natural reading of [the statute] places the burden on Plaintiff to allege and prove actual damages that it sustained as a result of Defendant's alleged infringement." See Bass Tank, LLC v. Met Inc., No. 22-cv-01086, 2025 WL 300612, at *4 (W.D. Okla. Jan. 24, 2025).

Plaintiff alleges that Defendant "repeatedly contact[ed] DAS's vendors and falsely insinuate[ed] [that] DAS was insolvent and was unable to meet its obligations to those vendors." (Doc. No. 1 ¶ 194.) Plaintiff asserts that Defendant did so to "drive a wedge between DAS and its vendors so that Love's could take those vendors for its own use and cut DAS out," and "maliciously engaged in this disparagement of DAS's business for Love's own gain." (Id. ¶¶

195–96.) As a result, Plaintiff allegedly "suffered significant damages." (Id. ¶ 197.)

Defendant asserts that Plaintiff's deceptive trade practices claim warrants dismissal because "Plaintiff fails to plead any tangible harm from [Defendant's] alleged misrepresentations." (Doc. No. 9 at 25.) Defendant states, in particular, that "Plaintiff does not allege that any of its vendors decreased business with Plaintiff" or that "Love's actually took any vendors." (Id. at 25–26.) Plaintiff rightly points out, in response, that "Love's, [in its brief in support of its motion to dismiss,] only challenges the existence of damages [regarding the ODTPA claim] and does not contest that Love's conduct was sufficiently alleged." (Doc. No. 15 at 25 n.6.) The Court thus limits its review to consideration of whether Plaintiff's complaint sufficiently pleads damages for purposes of its ODTPA claim.

Plaintiff, in its rebuttal with respect to the damages question, states that it properly alleged that it "suffered significant lost revenue (among other things) as a result of Love's conduct," (Doc. No. 15 at 26), and cites to the allegations in the complaint that DAS suffered "steady and substantial decreases in sales revenue," as a result of Defendant's deletion of categories of items for purchase from the parties' "plan-o-grams," and that "DAS's sales to Love's . . . decreased in real dollars year over year and eventually to zero as Love's implemented its plan to eliminate DAS even before the end of the Term." (Doc. No. 1 ¶¶ 132–41.)

Upon careful consideration of the allegations of Plaintiff's complaint, the briefs of the parties, and the relevant authority, and accepting as true all factual allegations in Plaintiff's complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiff, the Court finds that Plaintiff's complaint plausibly alleges a claim under the OTDPA. It is not clear the extent to which the harms that Plaintiff alleges—including "steady and substantial decreases in sales revenue" (Doc. No. No. 1 ¶¶ 132–141)—are directly

attributable to the alleged disparagement underpinning the ODTPA claim. However, the Court finds it a reasonable inference, viewed in the light most favorable to Plaintiff, that the alleged disparagement led to at least some of the alleged harms. See In re Ins. Brokerage Antitrust Litig., 618 F.3d at 312 (stating that courts must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff). As stated previously, whether Plaintiff will ultimately proffer sufficient evidence to prevail on this claim is a question to be answered at a later stage. Accordingly, the Court will deny Defendant's motion as to this claim.

**G. Plaintiff's Unjust Enrichment Claim (Count VIII)**

Plaintiff also asserts an unjust enrichment claim, arguing that Defendant acted improperly by "meeting with and hiring former senior level executives and misusing their knowledge to deprive DAS of the fruits of its labor," and by "contacting longstanding DAS vendors to negotiate without DAS's input." (Doc. No. 1 ¶ 202.)

In moving to dismiss this claim, Defendant argues that, because there is an express, enforceable contract governing this dispute, Oklahoma law requires dismissal. (Doc. No. 9 at 26.) Plaintiff does not respond to Defendant's argument as to the unjust enrichment claim in its opposition brief. See (Doc. No. 15). Defendant accordingly argues in reply that, because "Plaintiff did not attempt to substantively rebut this argument . . . Plaintiff's unjust enrichment claim should be dismissed." (Doc. No. 16 at 16.)

Because Plaintiff did not respond to Defendant's motion with respect to the unjust enrichment claim, the Court finds that Plaintiff has waived any opposing argument and that the claim should be dismissed. See Coit v. Wynder, No. 22-cv-01277, 2025 WL 2656069, at *9 (M.D. Pa. Sept. 16, 2025) (stating that "Coit's failure to specifically address Defendants' motion

to dismiss his general cruel-and-unusual claim in his opposition brief constitutes a waiver or abandonment of this claim").

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Counts II–VIII of Plaintiff's complaint will be granted in part and denied in part. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania